# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL HOOVER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-00051** |
| | ) | |
| **JUSTIN DUE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Pending before the Court are Defendant Putnam County Sheriff's Office Deputy Justin Due's Motion for Summary Judgment (Doc. No. 70) and Plaintiff Michael Hoover's Partial Motion for Summary Judgment (Doc. No. 75). Both motions have been fully briefed and are ripe for review. (Doc. Nos. 71, 76, 82–83, 87–88.) For the following reasons, the Court will grant in part and deny in part Due's Motion for Summary Judgment (Doc. No. 70) and deny Hoover's Partial Motion for Summary Judgment (Doc. No. 75).

## UNDISPUTED FACTS

The facts in this section are undisputed unless specifically noted otherwise and are drawn from the undisputed portions of the parties' statements of facts,[1] the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing that are not contradicted by the evidence in the record.

---

[1] The Court's Local Rules dictate that "[e]ach fact must be supported by a specific citation to the record." L.R. 56.01(b). Moreover, "[a]ny party opposing the motion for summary judgment must respond to each fact set forth by the movant by either: (1) agreeing that the fact is undisputed; (2) agreeing that the fact is undisputed for the purposes of ruling on the motion for summary judgment only; or (3) demonstrating that the fact is disputed." L.R. 56.01(c). To demonstrate a fact is disputed, a party must provide a "specific citation to the record." Id. Accordingly, offered facts or responses not consistent with the forgoing are not credited.

1

This case stems from a marital dispute between Michael Hoover and his wife, Chelsea Hoover, on October 31, 2021. (Doc. No. 84 ¶ 1).[2] That evening, Chelsea[3] was at a bar with a friend, Ashley Kinnett, when she received a text message from her mother that Hoover was moving Chelsea's belongings outside of their shared home at 1783 Dyer Creek Road. (Id. ¶ 4). It was raining, so Chelsea and Kinnett left the bar to confront Hoover. (Id. ¶¶ 5–6). When Chelsea and Kinnett arrived, Chelsea and Michael Hoover began screaming at each other about Chelsea's belongings. (Id. ¶ 7). Chelsea's mother and young daughter were also present. (Id. ¶ 8).

Though the parties dispute the precise details of what happened next, at some point, all three engaged in an argument, and Hoover grabbed Kinnett either by the back of her head and neck or her sweatshirt. (Id. ¶¶ 10–13, 15). At some point thereafter, Chelsea began recording Hoover with her cellphone (see generally Doc. No. 59-6), and Ashley Kinnett called 911. (Doc. No. 84 ¶ 16). Prior to the 911 operator answering the phone, Chelsea can be heard on her video recording, saying, "Call the law, he needs to be arrested." (Doc. No. 84 ¶ 14; compare Doc. No. 59-8 at 0:06–0:10 (providing Hoover's address roughly eight seconds into the 911 call); with Doc. No. 59-6 at 0:14–0:51 (providing Hoover's address thirty-five seconds after making the statement)). The video recording does not show any physical altercation between Hoover, Chelsea, or Kinnett. (See generally Doc. No. 59-6)

During the 911 call, Kinnett identified Michael Hoover as her assailant. (Doc. No. 84 ¶ 17). The 911 operator promptly transferred her call to the Putnam County Sherriff's Department.

---

[2] The proposed facts and responses are identical in Plaintiff's Response to Defendant's Statement of Undisputed Facts (Doc. No. 84) and Plaintiff's Response to Defendant's Own Statement of Undisputed Material Facts in Response to the Plaintiff's Partial Motion for Summary Judgment (Doc. No. 89). To avoid redundancies, the Court will cite only to the former as it recites the undisputed facts of this case.

[3] For clarity, the Court will refer to Chelsea Hoover by her first name.

(Doc. No. 59-8 at 0:32). After being transferred, Kinnett again identified Hoover as her assailant and provided his address. (Doc. No. 84 ¶ 17). Kinnett advised the dispatch operator that she would press charges and asked for them to "send somebody out here." (Id. ¶ 18).

The dispatch operator then asked whether Hoover had any weapons. (Id. ¶ 19). When Kinnett responded affirmatively, (id. ¶ 20; Doc. No. 59-9 at 1:02–1:04), the dispatch operator asked whether Hoover "threatened to use them on [Kinnett]." (Doc. No. 84 ¶ 21; Doc. No. 59-9 at 1:04–1:05). Kinnett responded, "Yes." (Doc. No. 84 ¶ 21; Doc. No. 59-9 at 1:06–1:07). The dispatch operator then asked if Hoover threatened Kinnett with a gun, and Kinnett responded, "Yes, ma'am." (Doc. No. 84 ¶ 22; Doc. No. 59-9 at 1:11–1:14).

While Kinnett remained on the phone with the dispatch operator, Chelsea also stated, ". . . you want charges pressed, absolutely[,] and I am pressing charges as well." (Doc. No. 59-6 at 1:34–1:37). When Chelsea said this, she was turning away from Kinnett and walking towards Hoover. (Id.). Her words were not picked up on the recording of the call. (Doc. No. 59-9 at 0:22–0:26).

Immediately after Kinnett stated that Hoover had threatened her with a gun, the dispatch operator announced over the police radio, "1783 Dyer Creek Road, Michael Hoover residence, domestic in progress, Mike Hoover grabbed the caller by the neck." (Doc. No. 84 ¶ 23). Due, on duty at the time, responded, "10-4, en route." (Doc. Nos. 79 ¶ 5; 84 ¶ 24). The dispatch operator then stated, "Units responding. Be advised weapons on scene. Caller has advised that the male threatened her with a gun." (Doc. Nos. 79 ¶ 6; 84 ¶ 24). Due received no other substantive information about what to expect when he arrived at Hoover's home. (Doc. Nos. 79 ¶ 7).

Due arrived at the Hoover residence approximately five minutes later and parked in the driveway when he saw Kinnett approaching his vehicle. (Doc. No. 79 ¶¶ 9–10). Kinnett said

something to the effect of "he's crazy" and "there he is at the door." (Doc. No. 79 ¶ 12). She then began walking with Due towards the open door of Hoover's attached two-car garage and pointed in Hoover's direction. (Doc. No. 59-6 at 8:04–05). At the time, Chelsea was standing outside of the garage, and her mother was tending to her daughter inside the garage. (Id. at 8:05–08). Hoover was in the threshold between the garage and the rest of his home. (Id.). As Due approached the garage, he ordered Hoover to show him his hands. (Id. at 8:05–09). Chelsea then turned the camera away from Due, who was still walking toward the garage, and toward Hoover. (Id.). The video clearly shows that Hoover complied and that his hands were empty. (Id.).

While Chelsea's camera was focused on Hoover with his hands up at the far side of the garage, Due walked back into frame. (Id. at 8:10–11). He had entered the garage and engaged Hoover as he approach him. (Id. at 8:09–10; Doc. No. 84 ¶ 34). Hoover did not move, but kept his hands raised. (Doc. No. 56-9 at 8:10–12; Doc. Nos. 79 ¶ 19; 84 ¶ 35).

As he approached Hoover, Due drew his service weapon and pointed it in Hoover's direction. (Doc. Nos. 79 ¶ 20; 84 ¶ 37). In response, Hoover said, "Don't be drawin' out on me. I've not done anything wrong. Why are you getting so aggressive?" (Doc. No. 59-6 at 8:12–14; Doc. No. 79 ¶ 21). Due told Hoover that Kinnett said that he "pulled a gun" on her, and Hoover responded, "I don't care. So you're taking her word over anyone else's?" (Doc. No. 59-6 at 8:12–15; Doc. No. 79 ¶ 22). Due answered, "Until I get things secure, yes, I am." (Doc. No. 56-9 at 8:17–19; Doc. No. 79 ¶ 22).

Hoover then lifted his shirt several inches above his midsection, and spun, telling Due, "Look. Nothing on me." (Doc. No. 56-9 at 8:19–21; Doc. No. 79 ¶ 23). Due holstered his weapon. (Doc. No. 79 ¶ 24). Hoover raised his hands a second time, and Due simultaneously took hold of

4

Hoover's right hand, told him to put his hands behind his back, and ascended the final two steps that connected the floor of the garage and the inside of the home. (Doc. No. 56-9 at 8:21–23).

At this point in the video, Hoover is completely blocked by Due's body and Chelsea, who continued to film the incident from several feet away, begins talking to her mother and drowning out Hoover and Due. (See generally Doc. No. 59-6 at 8:23–26). However, Due clearly stepped with his right foot into the house to detain hoover as they both continued to argue about placing Hoover in cuffs. (Id.). The two continued to wrestle when Due then pushed Hoover into the wall immediately behind him. (Id.).

Chelsea, still filming, followed Due and Hoover into the hallway of the home with a clear vantage of what followed. (Id. at 8:26–54). The video evidence shows that Due then ordered Hoover to get on the ground, (id. at 8:26–27; Doc. No. 79 ¶ 31), and placed his right hand under Hoover's arm to try to turn him around. (Id. at 8:26–27; Doc. No. 79 ¶ 32). Hoover responded by looping his left arm under Due's right arm, in what Due described as a "arm bar lock-joint manipulation." (Id. at 8:26–29; Doc. No. 84 ¶ 31). Due then freed his right arm, and punched Hoover in the eye with his left hand. (Id. at 8:29–31; Doc. No. 79 ¶ 37). The two continued to hand-fight, and Hoover managed to push Due a few steps backwards. (Id. at 8:31–34; Doc. No. 79 ¶ 37). Due then secured his footing, and pushed Hoover again, sending him into the drywall behind him. (Doc. No. 59-6 at 8:34–36; Doc. No. 79 ¶ 32). Due continued to order Hoover to "get on the ground," and the tussle continued for a few seconds before Chelsea and her mother were able to get Due's attention and tell him that Hoover never "pulled a gun" on anyone. (Doc. No. 59-6 at 8:36–54; Doc. No. 79 ¶¶ 38–39). At that point, Due immediately stopped using any force on Hoover. (Doc. No. 59-6 at 8:36–54; see also Doc. Nos. 84 ¶ 59). The following day,

Hoover was arrested and charged with assaulting Kinnett, assaulting a first responder, and resisting arrest. (Doc. Nos. 84 ¶ 64).

On October 26, 2022, Hoover brought this suit against Due and Putnam County, TN, alleging violations of the Fourth and Fourteenth Amendments, as well as the Civil Rights Act of 1871, 42 U.S.C. § 1983. (See generally Doc. No. 1). The claims against Putnam County, TN have since been dismissed, (Doc. No. 43 at 1), and, in the third iteration of the complaint, only three claims against Due remain: (1) unlawful entry; (2) use of excessive force; and (3) malicious prosecution. (Doc. No. 51 ¶¶ 54–78).

While Hoover's unlawful entry and excessive force claims concern the October 31, 2021, incident his malicious prosecution claim addresses the "assaulting a first responder" and "resisting arrest" charges and their effect on Hoover's livelihood. (Doc. No. 51 ¶¶ 63–71). According to the Second Amended Complaint, these charges prompted a construction company, MasTec, to not award projects to Hoover's company, PLC Traffick Control, LLC ("PLC"), out of concern that the charges would deter off-duty officers from working for PLC, and, as a result, PLC would struggle to meet its staffing needs. (Id.). For this injury, the Second Amended Complaint seeks damages equal to the "[f]inancial loss to PLC for" those projects. (Doc. No. 51 at Sec. VII; see also id. ¶ 70).

## LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). The

6

moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case. Id.

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "But where, as here, there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted in the videotape.'" Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

Moreover, if, "after adequate time for discovery and upon motion," the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case[] and on which that party will bear the burden of proof at trial[,]" a court should enter summary judgment in favor of the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When this occurs, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Id. at 323 (citation and internal quotation marks omitted). Conclusory statements "unadorned with supporting facts are insufficient." Viet v. Le, 951 F.3d 818, 823 (6th Cir. 2020). Thus, if the nonmovant does not support the elements of a claim or defense, the moving party is entitled to judgment as a matter of law.

7

## ANALYSIS

Due's motion seeks summary judgment on all three claims, arguing that qualified immunity protects him from further litigation, and, separately, that Hoover lacks standing to seek economic damages that PLC suffered through his malicious prosecution claim. (See generally Doc. Nos. 70, 71). Hoover's motion, on the other hand, seeks summary judgment only on his unlawful entry and excessive force claims, arguing that Due is not entitled to qualified immunity and the undisputed record evidence requires a ruling in his favor. (See generally Doc. Nos. 75, 76). Because questions of standing must be resolved before the merits of a claim, Imhoff Investment, LLC v. Alfoccino, Inc., 792 F.3d 627, 631 (6th Cir. 2015), the Court will begin with Due's standing argument and then turn to the parties' arguments on qualified immunity.

## I.      Malicious Prosecution and Standing

Due seeks summary judgment on Hoover's claim that he "intentionally and knowingly lied under oath [and] . . . directly helped start a prosecution against H[oover] for [the assault against a first responder and resisting arrest] charges without probable cause."[4] (Doc. No. 51 ¶ 66; see also Doc. No. 70 at 3). Specifically, Due argues that Hoover lacks standing to recover for economic injuries PLC suffered for allegedly losing contracts with MasTec. (Doc. No. 71 at 29–31). As Due highlights, Hoover brought this case exclusively in his individual capacity, and, although PLC is a limited liability corporation, the record evidence—namely, Hoover's deposition testimony—indicates that Hoover does not hold shares in or otherwise own PLC. (Id.). Thus, so says Due, "the only party eligible to file for economic loss or damages would be PLC, not the Plaintiff." (Doc. No. 71 at 31).

---

[4] Hoover does not seek summary judgment on this claim, stating in his Memorandum of Law in Support of his Motion for Partial Summary Judgment that "disputed issues of fact which must be resolved by a jury" remain. (Doc. No. 76 at 4). However, Hoover offers no indicia as to which issues of fact he refers to. (Id.)

8

Hoover responds with two points. First, he argues that the Second Amended Complaint alleges a qualifying "injury in fact" by asserting that "PLC's losses harmed Hoover." (Doc. No. 83 at 24). Hoover further contends that, because he claims PLC's income on his personal tax return, "a loss to PLC is equally a loss to Hoover," (id.), and likens this injury to lost wages, which the Sixth Circuit has deemed a proper injury. (Id. (citing Wesley v. Campbell, 864 F.3d 433, 445 (6th Cir. 2017))). Second, Hoover argues that "his civil rights were violated, not PLC's," so "only he can bring the underlying claim." (Id.).

Under Article III of the Constitution, a plaintiff must have standing to sue in federal court. To do so, a plaintiff must show: (1) some concrete, particularized, and actual or imminent injury in fact; (2) that the defendants likely caused the injury; and (3) that judicial relief would likely redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Hurst v. Caliber Home Loans, Inc., 44 F.4th 418, 423 (6th Cir. 2022). Relevant here is the first element: "injury in fact." To meet this standing requirement, a plaintiff must show "an injury to himself that is 'particularized,'" meaning it "must affect the plaintiff in a personal and individual way." Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016). This showing must be more than mere allegations; at summary judgment, he or she must "present enough evidence to create a genuine issue of material fact over each standing element." Davis v. Colerain Twp., Ohio, 51 F.4th 164, 171 (6th Cir. 2022); see also McKay v. Federspiel, 823 F.3d 862, 867 (6th Cir. 2016) ("This means that, in response to a summary judgment motion, a plaintiff cannot rely on mere allegations with respect to each standing element, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.") (internal quotation marks and citation omitted).

9

Hoover has offered no evidence that he has suffered an injury in fact. Crucially, Hoover does not own PLC. (Doc. No. 59-24 at 2:13–14). As he explained in his deposition, PLC belongs to a trust. (Id.). Likewise, no record evidence indicates the nature of the trust, the beneficiary of the trust, how funds are dispersed, who the trustee is, or any other details that might illustrate that Hoover receives a portion of PLC's earnings, let alone all of PLC's profit. Presumably, Hoover has some connection to PLC, and enjoys some benefit from having structured PLC's ownership in this way. But, simply put, the record evidence does not bring that to bear.[5] Without evidence of any other alleged injury, Hoover lacks standing to sue for injuries to PLC and his malicious prosecution claim must be dismissed.

## II.     Hoover's Remaining Claims and Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Williams v. Maurer, 9 F.4th 416, 430 (6th Cir. 2021) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right, and (2) the right was clearly established." Id. (citing Bishop v. Hackel, 636 F.3d 757, 765 (6th Cir. 2011)).

"Once raised, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity." Williams, 9 F.4th at 430 (citing Bletz v. Gribble, 641 F.3d 743, 760 (6th Cir. 2011). Therefore, "although on summary judgment this Court views the factual evidence and

---

[5] Hoover's contention that he claims PLC's income on his tax returns, even if true, without more, is not enough. See Davis, 51 F.4th at 171 (requiring "enough evidence to create a genuine issue of material fact" to establish standing at summary judgment).

draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right." Id. Because Due asserts that qualified immunity on both remaining claims, the Court will address Hoover's unlawful entry and excessive force claims in turn.

### A. Unlawful Entry

Hoover's first cause of action alleges that Due entered Hoover's garage to detain him without a warrant or any other lawful basis.

### i. Violation of the Hoover's Fourth Amendment Rights

The Fourth Amendment provides, in relevant part, that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. CONST. amend IV. "Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, [the Supreme] Court has inferred that a warrant must generally be secured." Kentucky v. King, 563 U.S. 452, 459 (2011). The Supreme Court also explained that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585–86 (1980) (internal quotation marks and citation omitted). Therefore, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Id. at 586. But that presumption is subject to certain exceptions. Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (citation omitted).

The parties agree that Due made a warrantless entry into Hoover's home when he entered Hoover's garage. (Doc. Nos. 71 at 12; 76 at 5). They also agree that the constitutionality of Due's

11

entry turns on one of two well-recognized exceptions to the warrant requirement, i.e., whether: (1) Due obtained Chelsea's consent, or (2) there were exigent circumstances—specifically, the need to administer emergency aid. (See generally Doc. Nos. 71 at 13 (arguing both exceptions were present); 88 at 1–4 (arguing neither was present)).

Whether consent or exigent circumstances exist are questions for the jury unless "a finder of fact could reach but one conclusion." Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002); see also United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) ("Whether consent to a search is voluntarily given is a question of fact"). If a reasonable jury could conclude that Due lacked both consent and exigent circumstances when making his warrantless entry, the Court must proceed to the second stage of its qualified immunity analysis. See Barton v. Martin, 949 F.3d 938, 949 (6th Cir. 2020).

The Court will first address whether a reasonably jury could find that Due obtained Chelsea's consent to enter Hoover's home prior to walking into the garage. "A search conducted pursuant to voluntarily obtained consent is a well-recognized exception to the Fourth Amendment's warrant requirement." Andrews v. Hickman Cnty., Tenn., 700 F.3d 845, 854 (6th Cir. 2012); see also Harajli v. Huron Twp., 365 F.3d 501, 506 (2004) ("A search by police, however, does not violate the Fourth Amendment if 'voluntary consent has been obtained . . . '") (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)). "Consent must be proved by clear and positive testimony, and to be voluntary it must be unequivocal, specific, and intelligently given." United States v. Canipe, 569 F.3d 597, 602 (6th Cir. 2009) (internal quotation marks and citation omitted); see also United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998) (quoting United States v. Scott, 578 F.2d 1186, 1188–89 (6th Cir. 1978)). "The burden to establish that the exception

12

applies is on the officer invoking consent." Andrews, 700 F.3d at 854 (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)).

In his motion, Due argues that Chelsea gave him consent because she "expressed [to others] that she wanted law enforcement to be called to the home and even stated that she intended to file charges on the Plaintiff." (Doc. No. 71 at 13). In his response to Hoover's motion, Due expands on this argument, reiterating that the record evidence demonstrates that Chelsea "undisputedly wanted law enforcement assistance and asked Ms. Kinnett to call for law enforcement" and later told her mother that she was pressing charges. (Doc. No. 82 at 10). Due also notes that "[m]inutes later, as Due walked past [Chelsea] . . . she did not tell him to stop, leave[,] or in any way indicate that he was not welcome to come in and investigate." (Id.).

A reasonable jury could conclude that this evidence does not amount to clear, positive, unequivocal, specific, and intelligently given consent to enter Hoover's home. Chelsea's statements to Kinnett and her mother were not directed towards Due or any other law enforcement officer, nor were they made in earshot of Due or any other law enforcement officer. And, as the video recording clearly shows, Due did not interact with Chelsea before confronting Hoover after Due had already entered the garage. In fact, before engaging Kinnett and entering the garage, Due never confirmed the information the 911 operator provided, specifically, who was the homeowner; who was the 911 caller; who had been threatened; and who, allegedly, had a firearm. Accordingly, a reasonable jury could find that Due never "obtained" Chelsea's intelligent consent to enter Hoover's home, as the Fourth Amendment requires for warrantless searches. See Harajli, 365 F.3d at 506 ("A search by police, however, does not violate the Fourth Amendment if 'voluntary consent has been obtained . . .'"). For this same reason, Chelsea's lack of objection is insufficient. After all, consent must be "unequivocal, specific, and intelligently given." Canipe, 569 F.3d at 602.

13

The single case on which Due relies, <u>Harajli v. Huron Township</u>, 365 F.3d 501 (6th Cir. 2004), does not support his argument otherwise. There, the Sixth Circuit considered whether police officers reasonably believed a woman provided consent to enter a home when she "had requested that the officers accompany her because she was 'scared to go by [her]self over there'" and did not object when an officer entered her home. <u>Id.</u> The panel reasoned that, while she did not "recite the talismanic phrase: 'you have my permission to search,' . . . the circumstances clearly indicated that she wanted the officers to accompany her inside the house in order to ensure her safety." <u>Id.</u> at 506. In this respect, the panel did not rely on what she, as Due puts it, "undisputedly wanted," (Doc. No. 82 at 10), or expressed to third parties. <u>Harajli</u>, 365 F.3d at 506. Rather, it hinged its reasoning on the direct request made to law enforcement officers asking them to accompany her into her home. <u>Id.</u> Here, Chelsea, through Kinnett, called 911 to have the police come to her home to arrest Hoover. But Due never identified or interacted with Chelsea when he arrived so it was impossible for him to obtain her consent to enter the home. Though Due argues in his briefing that he relied on Chelsea's consent when entering Hoover's home, the record evidence reveals otherwise. In his deposition, Due explained that on the night in question he believed exigent circumstances permitted his warrantless entry, nothing more. (Doc. No. 81-1 a 2). And Due points to no record evidence indicating he believed that Chelsea—or anyone else on the scene—lived in the home. (Doc. No. 71 at 13). A reasonable jury could not find that Due obtained Chelsea's consent to enter the home to detain Hoover.[6]

Next, the Court must address whether a reasonably jury could find that Due did not have sufficient information of exigent circumstances when he entered the Hoover's home to detain him.

---

[6] Due does not argue that he relied on Kinnett's apparent authority to enter Hoover's home. (<u>See</u> <u>generally</u> Doc. No. 71). Accordingly, the Court need not consider it.

"This exception enables law enforcement officers to handle 'emergenc[ies]'—situations presenting a 'compelling need for official action and no time to secure a warrant." Lange v. California, 594 U.S. ----, 141 S. Ct. 2011, 2017 (2021); see also Barton, 949 F.3d at 948 (6th Cir. 2020) (requiring a "real immediate and serious consequences that would certainly" occur were a police officer to postpone action to get a warrant). Although the Sixth Circuit and Supreme Court have recognized several different kinds of exigent circumstances, relevant here "is the need to assist persons who are seriously injured or threatened with such injury." Brigham City, 547 U.S. at 403. Under this "emergency aid exception," "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. (citing Mincey v. Arizona, 437 U.S. 385, 392 (1978)). In other words, "exigent circumstances exist when a reasonable officer could believe that there are 'real immediate and serious consequences' that would certainly occur were a police officer to 'postpone action to get a warrant.'" Barton, 949 F.3d at 948 (quoting Ewolski, 287 F.3d at 501).

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of circumstances." McNeely, 569 U.S. at 149; see also id. at 150 ("[T]he fact-specific nature of the reasonableness inquiry demands that [the Court] evaluate each case of alleged exigency based on its own facts and circumstances."). The "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." Michigan v. Fisher, 558 U.S. 45, 47 (2009). Nor do officers need "ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." Id. at 49. Rather, "it requires . . . an objectively reasonable basis for believing that a person within the house is in need of immediate aid." Id. "[G]eneric

15

possibilities" of danger are not applicable; defendants must offer a "particularized showing of a risk of immediate harm." Morgan v. Fairfield Ctny., Ohio, 903 F.3d 553, 562 (6th Cir. 2018).

Here, the undisputed facts do favor Hoover's or Due's version of events to decide this issue. Depending on how the disputed evidence is construed, a reasonable jury could find either that exigent circumstances supported Due's warrantless entry into the garage or that Due lacked the objectively reasonable basis for believing that a person within the home was in need of immediate aid to justify confronting Hoover inside his home. The Court will begin with Due's argument that the record evidence requires finding that exigent circumstances existed.

In his opening brief, Due argues he had an objectively reasonable basis to enter the home based solely on the information he gained from the 911 dispatch operator. Specifically, Due argues, "[M]ultiple exigent circumstances existed to justify [his] entry on the property and the home: a threat with a gun; a domestic in progress; the identification of the Plaintiff being the person who did the threatening of the caller with a gun, etc." (Doc. No. 71 at 13). While Due does not indicate what reasonable bases he attempts to capture under "etc." (See generally Doc. No. 71), his response to Hoover's Partial Motion cites Kinnett's statement, "There he is at the door." (Doc. No. 82 at 11).

Due relies heavily on the Sixth Circuit's decision in Schreiber v. Moe, in which police responded after "someone had called 911 who claimed to have been talking to Schreiber's teenage daughter, Sarah, on the telephone and had heard her parents yelling." 596 F.3d 323, 326 (6th Cir. 2010). "According to the caller, the telephone call had suddenly been disconnected, and, when the caller called Sarah back, Schreiber hung up the phone," and "[t]he caller believed that Sarah was 'getting beat.'" Id. "The police officer investigating the call claimed that, upon arriving at Schreiber's apartment, he could hear an "angry male voice yelling profanities." Id. The officer

16

knocked on the door, and, while a young boy answered, the officer could "see Schreiber yelling at someone in the home." Id. "Shortly thereafter, Schreiber came to the door, and according to [the officer], Schreiber was shouting [profanities]." Id. According to the police officer, after he told Schreiber that he only wanted to check on Sarah's welfare and Schreiber replied, "no, you fuckin' don't," he entered the home. Id. At summary judgment, the police officer asserted that his warrantless entry fell under the ambit of qualified immunity and the emergency aid exception. Id. at 328–29.

In concluding that "no reasonable jury would dispute that [the officer] had an 'objectively reasonable basis for believing' that Sarah was at risk of imminent injury" and the emergency aid exception applied, the panel relied heavily on the officer's observations on the scene. Id. at 331. As the panel explained:

> [The officer] knew that a 911 caller who had recently spoken with Sarah thought she was being beaten, and, upon investigating, [the officer] discovered an irate father so lacking in self-control that he shouted profanities at an officer who was simply checking on her welfare. It is true that this case lacks some of the more outward manifestations of violence that often support a finding of exigency. In particular, there were no signs of blood, broken objects, or gunfire. But these are not prerequisites to a finding of exigency. As the Supreme Court has noted, officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception. As in Fisher, here it sufficed to invoke the emergency aid exception that it was reasonable to believe that . . . Schreiber was about to hurt, or had already hurt, Sarah.

Id. (internal quotation marks, brackets, and citations omitted).

According to Due, the facts at hand "were much more serious and potentially dangerous than those in Schreiber." (Doc. No. 71 at 14). Specifically, Due argues:

> Upon arrival it was reasonable for Due to believe that a deadly threat had been made with a gun, that a deadly threat existed, and that he could not take his attention of the lethal threat, the Plaintiff, until the safety of all involved was secured. In Due's immediate view was the Plaintiff standing inside the doorway frame of the home with potential access to weapons just inches from him, three adult females and a small child.

17

(Id. at 15).  To the extent that Schreiber is instructive, it cuts against Due's position.  Indeed, unlike the officer in Schreiber, Due does not base his reason for entry on any behavior of the alleged assailant he witnessed.  Nor does he provide any events or information other than what was relayed to him by the 911 dispatch operator for his objective reasonable basis that Hoover was about to hurt or had already hurt Chelsea, Kinnett, or anyone else at the home.  To the contrary, upon Due's arrival, he did not identify the persons present; everyone moved freely outside and inside the garage; no one appeared in distress, obviously injured, or in need of healthcare; and there was no firearm in view.  In short, Due's asserted basis for entering Hoover's garage was that the 911 dispatcher told him that Hoover had threatened the 911 caller with at least one gun and, when he arrived, Hoover might still have had possession of or access to multiple weapons.  Due argues that the reported presence of the gun obviated the need for any further indicia that the emergency aid exception applied, (see Doc. No. 82 at 12), but as Hoover points out, this is not the law, (see Doc. No. 83 at 3 (quoting Morgan, 903 F.3d at 562 (6th Cir. 2018)) ("The mere presence of firearms does not create exigent circumstances.")).

Due's position is further undermined by other facts indicating that no person in the home had been seriously injured or was, at the time of his entry, threatened with imminent injury.  See Brigham City, 547 U.S. at 403.  For one, when he arrived at Hoover's residence, Due was approached by Kinnett, who had no visible signs of injury and moved around without any apparent difficulty.  Likewise, as Due neared the open garage, Chelsea, who also had no visible signs of injury, was able to exit the garage freely.  Based on the clear video evidence, Chelsea was standing squarely outside of the garage when Due walked in.  (Doc. No. 59-6 at 8:05–09).  These facts, viewed in the light most favorable to Hoover, allow a reasonable jury to conclude that both women could freely leave or move about Hoover's home despite whatever threat he had made and that

18

both were far from under any immediate threat Hoover still posed. Chelsea's mother and daughter—the only two people in the garage with Hoover—also did not appear distressed or restricted; Chelsea's mother had her back to Hoover and was providing childcare when Due arrived, (id. at 7:57–8:09), not the behavior one would objectively expect if they were in immediate fear.

Perhaps most compelling is Hoover's own conduct. While Hoover and Chelsea certainly yelled at each other before Due arrived, (Doc. No. 59-6 at 0:01–7:56), the video recording does not capture Hoover yelling or otherwise arguing in the moments immediately before Due's warrantless entry. (Id. at 7:56–8:05). In fact, the video recording appears to show—though does not definitively establish—that Hoover held up his hands just before Due entered the garage. (Id. at 8:08–10). Construing these facts in Hoover's favor, a reasonable jury could conclude that Due lacked an objectively reasonable basis for believing that a person in Hoover's home was seriously injured or imminently threatened with such injury and in need of immediate aid. Brigham City, 547 U.S. at 403.

At the same time, Hoover's contention that a reasonable jury could never conclude that exigent circumstances existed is unpersuasive. Construing the record evidence in Due's favor, as the Court must do in considering Hoover's Motion for Partial Summary Judgment, a reasonable jury could find that the limited indicia available to Due that exigent circumstances were not present did not outweigh the objective information Due had received from the dispatch operator.

As explained above, Due arrived at Hoover's home believing he would be confronting an ongoing domestic assault involving multiple weapons and a threat with a gun. He found three women and a young child outside the home or in the garage late at night. For Due, this may have created greater uncertainty; Due did not know who made the 911 call or whether the caller, or any

19

others, were deeper inside the home and out of sight.  As Due exited his patrol car, he was met by Kinnett, who told Due, "He's crazy," and, "There he is at the door."  (Doc. No. 59-6 at 8:05).  Due, expecting a man to be involved in the "domestic" he was called to investigate and now looking into the garage, would have then seen Hoover in the threshold between the garage and the rest of his home.  (Id.).  At this point, Due had to choose between collecting more information and confronting the man Kinnett identified.  Unsure whether Hoover was armed but believing he had multiple guns at least accessible to him and had recently threatened someone with them, Due immediately ordered Hoover to show him his hands and entered the garage to secure the scene.  (Id. at 8:06–10).  The record evidence does not definitively show where Due was when Hoover showed him his hands.  Between the information from the dispatch officer, Kinnett's corroboration on the scene, and the uncertainty of whether Hoover was armed, a reasonable jury could conclude that the totality of the circumstances amounted to a particularized showing of risk of imminent harm.

In his brief, Hoover claims that Due "had no objective evidence that the woman outside was the 911 caller or that the man he saw was the same man mentioned by the called," (Doc. No. 76 at 8), and argues Hoover "could have asked either of them to confirm any 'hunch' but did not do so."  (Id.).  Construing the facts in Due's favor, common sense would instruct otherwise.  Due expected to find a "domestic" altercation between Michael Hoover and a woman.  Although he did not recognize Hoover that evening, Due was met by a woman pointing to a man and saying, "He's crazy," and, "There he is at the door."  The conclusion that the man pointed out was the alleged assailant thus could have been clearly based on more than a hunch or the 911 call alone.

Hoover's only other argument that the record evidence requires a ruling in his favor is that his hands were up when Due entered the garage.  (Doc. No. 76 at 8–9).  But as previously

20

discussed, because Chelsea's video recording does not show both Hoover and Due at the exact moment Due entered the garage, it may be that Hoover put his hands up just after Due made his warrantless entry. (Doc. No. 59-6 at 8:08–10).

At bottom, significant questions of fact regarding whether a constitutional violation occurred remain for a jury to decide. Because a reasonable jury could conclude that Due lacked both consent and exigent circumstances to enter Hoover's garage, the Court must proceed to the second prong of the qualified immunity analysis.

ii.   Clearly Established Right

At the second prong of the qualified immunity analysis, Hoover bears the burden of showing that Due's alleged unconstitutional conduct violated clearly established law. Williams, 9 F.4th at 430. "A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft, 563 U.S. at 741 (citation omitted).

On several occasions, the Supreme Court and Sixth Circuit have confirmed that the constitutional question of "whether an officer may enter one's home absent a warrant or an exception to the warrant requirement" is beyond debate. Barton, 949 F.3d at 949; see also Welsh v. Wisconsin, 466 U.S. 740, 748–49 (1984) ("Consistently with these long-recognized principles, the Court decided . . . that warrantless felony arrests in the home are prohibited by the Fourth Amendment, absent probable cause and exigent circumstances."); see also Williams, 9 F.4th at

21

438 ("After concluding that the officer's warrantless entry violated the Fourth Amendment, we explained that 'it was clearly established that warrantless entry into a home without an exception to the warrant requirement violated established law.") (quoting Barton, 949 F.3d at 949); see also Coffey v. Carroll, 933 F.3d 577, 587 (6th Cir. 2019) ("If the issues of fact are ultimately resolved in [the plaintiff's] favor, the officers violated the clearly established constitutional prohibition against unlawful entry"). As already explained, under Hoover's version of the facts, a reasonable jury could find that Due's warrantless entry into Hoover's home without consent or exigent circumstances violated the Fourth Amendment's prohibition against unreasonable searches. If the jury finds that there was no consent or exigent circumstances, then, as in Williams and Barton, Due's warrantless entry into Hoover's home violated clearly established law. Accordingly, Due is not entitled to qualified immunity on Hoover's unlawful entry claim.[7]

### B. Excessive Force

Hoover also alleges that Due exercised excessive force against him when Due: "(1) point[ed] his firearm at [] Hoover as Due entered the garage, (2) . . . grabbed Hoover's right hand as he stood in the doorway, (3) push[ed] Hoover backwards into the hallway and against the wall, (4) punch[ed] Hoover in the face, and (5) continu[ed] to push and grab Hoover after punching

---

[7]  Separately, Due invokes Section 36-3-619(a) of the Tennessee Code as justification for his warrantless entry. (Doc. No. 71 at 15). Section 36-3-619(a) instructs:

> If the law enforcement officer has probable cause to believe that person has committed a crime involving domestic abuse, whether the crime is a misdemeanor or felony, or committed within or without the presence of the officer, the preferred response of the office is arrest.

Tenn. Code. Ann. 36-3-619(a). However, Due makes no attempt tie to this provision to any cognizable standard of law. (See Doc. No. 71 at 15–16 (merely block quoting the statute before returning to his exigency argument)). Nor could he. The state's "preferred response" does not unseat Hoover's Fourth Amendment rights. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 (1989) (quoting Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 613 (1979)) (explaining that the Supremacy Clause "secures federal rights by according them priority whenever they come in conflict with state law."). This aside cannot win the day.

him." (Doc. No. 51 ¶ 59). In their dueling motions, both parties address each alleged instance of excessive force individually. (Doc. Nos. 71 at 23–27; 76 at 14–24).

"To determine whether force used by law enforcement was excessive, [courts] 'apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendant[], and not the underlying intent or motivation of the defendant[.]" Id. (quoting Brown v. Lewis, 779 F.3d 401, 418 (6th Cir. 2015)). That test is guided by three factors: the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officer or others; and whether he is actively resisting arrest or attempting to evade arrest by flight. Id. (quoting Brown, 779 F.3d at 418). But "these factors are not the end of the matter." Id. (quoting Martin v. City of Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013)). Ultimately, courts must account for the "totality of the circumstances" and ask "whether 'gratuitous violence' has been inflicted." See Williams, 9 F.4th at 439 (quoting Coley v. Lucas County, 799 F.3d 530, 539 (6th Cir. 2015)). However, Williams, which the Court cited above, both guides and streamlines the Court's analysis here.

In Williams, after the panel determined that the defendants were not entitled to qualified immunity at summary judgment on the unlawful entry claim, it turned to the related excessive force which alleged that an officer forcibly pushed the door to the plaintiff's home open and injured them, "caus[ing] the plaintiff] . . . to bleed and le[aving] a permanent scar." 9 F.4th at 438. As Due does here, the defendants in Williams argued that the force was reasonable because the emergency aid exception applied and the officer "had to act 'swiftly to ensure the safety of everyone inside the apartment.'" Id. However, the panel reasoned that without exigent circumstances, any force used to carry out a warrantless search and seizure could be found to be gratuitous. Id. As the panel explained, "a reasonable jury could conclude that the force used by

Defendants to forcibly open [the] door while [the plaintiff] lawfully attempted to assert her Fourth Amendment right to be free from an unreasonable search and seizure was 'gratuitous,' and accordingly, violated her Fourth Amendment right to be free from excessive force." Id.

The same reasoning applies here. If a jury finds that Due's warrantless entry to detain Hoover was unlawful, following Williams, it could find that the force used to detain him was gratuitous and violative of his Fourth Amendment right. Due's papers do not contemplate, even *arguendo*, that a reasonable jury could find that he unlawfully entered Hoover's home. (See generally Doc. Nos. 71, 82, 87). Because Due offers no argument that he is still entitled to summary judgment on Hoover's excessive force claims if the Court concluded otherwise, and the Court can consider any argument to that effect waived. See McPherson v. Kelsey, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort to develop argumentation, are deemed waived.").

Turning to the second prong of the qualified immunity analysis, Williams again is instructive. The Williams panel explained that it was clearly established that "warrantless entry into a home without an exception to the warrant requirement violates clearly established law" and "clearly established that gratuitous violence is never reasonable because there is simply no government interest justifying gratuitous violence." Williams, 9 F.4th at 440. Based on these principles, it concluded that, "[i]f Defendants forcibly entered [the plaintiff's] home armed with neither a warrant nor an exception to the warrant requirement, the use of any amount of force to effectuate this unconstitutional action constituted unreasonable 'gratuitous violence.'" Id. (quoting Walters v. Stafford, 317 F. Appx. 479, 491 (6th Cir. 2009)). As the panel "[p]ut differently, 'of course, if Defendants had no right to be inside the home, then they had no right to use force.'" Id. (quoting Hickey v. Hayse, 188 F. Supp. 2d 772 728 (W.D. Ky. 2001)).

Construing the facts in Hoover's favor, Due had no legal basis for attempting to detain Hoover in his home.  Accordingly, a reasonably jury could find that Due, by pointing a gun at, grabbing, pushing, punching, and fighting Hoover in his home in an effort to detain him was gratuitous and violated clearly established law.  Williams, 9 F.4th at 440.  By that same token, because this Court cannot say as a matter of law that Due unlawfully entered his home, Hoover is not entitled to summary judgment in his favor, and, were a jury to find that Due's warrantless entry was lawful, that jury would need to consider each alleged instance of excessive force.  Thus, Hoover's excessive force claim must proceed to trial.

## CONCLUSION

For the foregoing reasons, Due's Motion for Summary Judgment (Doc. No. 70) will be granted in party and denied in part and Hoover's Partial Motion for Summary Judgment (Doc. No. 75) will be denied.

An appropriate order will enter.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE